742 So.2d 746 (1999)
Albert William BLOCK, Jr., Plaintiff-Appellant,
v.
ST. PAUL FIRE & MARINE INS. CO., Defendant-Appellee.
No. 32,306-CA.
Court of Appeal of Louisiana, Second Circuit.
September 22, 1999.
*748 Albert W. Block, Jr., Monroe, Counsel for Plaintiff-Appellant.
Theus, Grisham, Davis & Leigh by Thomas G. Zentner, Jr., Monroe, Counsel for Defendant-Appellee.
Before NORRIS, C.J., and WILLIAMS and CARAWAY, JJ.
NORRIS, Chief Judge.
Plaintiff, Albert W. Block, Jr., appeals a district court judgment denying statutory penalties and attorney fees pursuant to La R.S. 22:658 and 22:1220, finding that the defendant insurer did not act arbitrarily, capriciously, or without probable cause in the handling of two claims under his homeowner's insurance policy. Block also appeals the court's failure to find policy coverage for a foundation damage claim. For the reasons expressed, we affirm.

Background
In November, 1996, a water heater malfunctioned in the residence of plaintiff, Albert W. Block, Jr., a Monroe attorney. Block promptly submitted the resultant claim to his insurer, St. Paul Fire and Marine Insurance Company, through his insurance agent, Thomas and Farr Insurance Company of Monroe. The claim was handled to Block's apparent satisfaction by an adjuster named Jerry Grimsley.
In addition to the damage to the water heater, some carpeting had suffered water damage. Block alleged that when the wet carpeting was removed, he discovered cracks in the concrete flooring of his house, indicating foundation damage.
Approximately a month later, on December 17, 1996, Block experienced problems when the drainage system of his washing machine backed up, which caused the washer to overflow.
For undetermined reasons, Block did not immediately report this problem to his agent as he had done earlier with the water heater. Instead, he retained a plumber, Potier, to provide an estimate for plumbing repairs. Potier found that the "P" drain had rusted underneath the washroom floor, and estimated that repairs would cost at least $2,150.
Meanwhile, Block commissioned an estimate from a foundation restorer to repair the foundation damage. Believing that the foundation damage was aligned with a tree in his front yard, Block also retained a forester, Steven Templin, to prepare a report stating that the foundation damage was attributable to the abnormal growth of a white oak tree in Block's front yard. According to Templin, because the tree grew a fairly sharp tilt away from the front end of the house, this caused the roots at the other end to press upward with tremendous force and create cracks in the rear of the foundation.
In essence, Block had two separate claims to present his insurer: the washroom claim and the foundation claim. Rather than submitting these claims to his agent, or directly to St. Paul, Block sent a letter dated April 7, 1997 simply to Jerry Grimsley at his former post office box. This letter was not answered until June, 1997. As explained by John Meyer, the St. Paul representative ultimately assigned Block's claim, this was because Mr. Grimsley was no longer employed by St. Paul in the area, having been transferred to Florida in January, 1997. Meyer, a technical claim specialist with St. Paul in Rock City, Illinois, testified that he received the letter *749 on June 3, 1997.[1] Upon receipt, Meyer immediately assigned the claim to insurance adjuster Kevin Zimmerman.
At trial, Mr. Zimmerman testified in detail about his unsuccessful efforts to contact Block by telephone in early June. On June 11, he wrote Block, asking to inspect the property and obtain a statement. The letter was answered on June 26, and an appointment for inspection was made for July 10, 1997. After Zimmerman's initial inspection on that date, he took steps to arrange a video camera inspection to ascertain the nature and location of the broken drain. Although Block was sure, based on his plumber's estimate, that the source of the washroom damage was the "P" drain, Zimmerman felt this needed to be verified by a mini-cam attached to the head of a Roto-Rooter line. Block apparently agreed to this procedure.
This inspection was delayed because the proper equipment had to be shipped to Monroe, and the parties could not coordinate a date for the camera inspection. Throughout July and August, 1997, several unsuccessful attempts were made to complete the inspection. In addition to scheduling difficulties, on at least one occasion, Block's wife denied Roto-Rooter access to the property and plaintiff did likewise on another visit. Block filed the instant suit on August 1, 1997. Thereafter, Block also insisted that St. Paul's counsel as well as his private plumber be present. Once the camera inspection was accomplished on September 22, 1997, Zimmerman prepared an estimate for the washroom repairs based on industry standards the next day. On October 3, 1997, St. Paul tendered a check for $1,960.20, which represented the amount of Zimmerman's estimate ($2,210.20) minus Block's policy deductible. Accompanying the check was a letter from Zimmerman which stated:
"As with estimates, there is the possibility of other damages to this area which we are unable to see. If this would be the case, I would appreciate it if you would please contact my office once repairs have begun so I can reinspect any additional damages which may be found."
Although he testified at trial that he received the tender, Block insisted that the amount was inadequate. He further testified that he never cashed the check or repaired the drain.
Concurrent with its efforts to investigate the washroom claim, St. Paul investigated Block's foundation claim. St. Paul sent consulting engineer Ron McKinley to Block's property to assess the nature, source, and extent of the foundation damage. McKinley inspected the premises on July 30, 1997, taking numerous photographs and detailed elevation measurements of the interior floor surface to establish the pattern and extent of foundation distortion. McKinley's investigation led him to conclude that the foundation problem was attributable to settling, resulting from soil subsidence beneath the structure. McKinley discovered that approximately the rear one-third of the house had sunk close to one inch off the grade. It was his opinion that the soil content (a high clay content) caused the soil to expand and contract as the moisture content changes, thereby allowing soil consolidation, which in turn caused the soil to lose much of its load-bearing properties. This ultimately resulted in slab settlement and the foundation cracks discovered by plaintiff. He added that such soil subsidence was a common problem in the Town and Country subdivision, where Block's house was located.
*750 In reaching his opinion, McKinley expressly rejected the contention by Block's forestry expert Templin, that the foundation problem was attributable to the roots of a white oak tree situated on the other side of the house. McKinley maintained that even if the roots were strong enough to crack the interior foundation, then they would also raise the wall footing. Evidence of this type of damage, however, was not present.
Block accompanied McKinley on his inspection, and McKinley testified that he informed Block at that time that he had a soil settlement problem rather than a tree root problem. Block filed this suit on August 1, 1997, two days after McKinley's inspection, and before St. Paul could prepare a formal denial of coverage letter on the foundation claim.
Block's petition requested that St. Paul pay the two claims that arose in December, 1996. In addition, Block demanded statutory penalties and attorney fees pursuant to La. R.S. 22:658 and 22:1220, claiming that the insurer violated its duty of good faith and fair dealing in processing his claims, that St. Paul did not comply with the statutory time limits imposed for the initiation of a claim investigation or for payment of claims, and that these actions were arbitrary, capricious, and without probable cause.
At a bench trial on the merits in March, 1998, the district court heard extensive testimony, including testimony from both sides' expert witnesses. The court also noted Templin's report, and permitted both sides to file post-trial briefs, taking the matter under advisement. In a Minute Entry and Order filed August 11, 1998, the court denied Block's claim for statutory damages related to the plumbing claim and further denied plaintiff's claim that St. Paul had acted arbitrarily or capriciously in handling the washroom and foundation claims, thereby denying the statutory damages associated with either claim. The court likewise denied Block's claim for foundation repair, noting that the damage was due to settling, which was excluded by the terms of the policy at issue.[2] In so doing, the court expressly accepted McKinley's view of causation as expressed in his testimony.
Block appeals, assigning error to the district court's finding that St. Paul had not acted arbitrarily, capriciously, and without probable cause with regard to handling either claim, and therefore he was not entitled to statutory damages or attorney fees. While not assigning it as error, Block also argues that the court erred in finding that the foundation claim was attributable to settling. Similarly, he further contends that soil subsidence more appropriately equates to a "collapse" under his policy and is covered.

Law and Analysis
La. R.S. 22:658 provides, inter alia:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
* * *
(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer *751 shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220. (4) All insurers shall make a written offer to settle any property damage claim within thirty days after receipt of satisfactory proofs of loss of that claim. B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.
La. R.S. 22:1220, cited in section 658, provides in relevant part:
A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:
* * *
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
These statutes are penal in nature, and therefore must be strictly construed. Hart v. Allstate, 437 So.2d 823 (La.1983). Penalties and attorney fees are not assessed unless it is clearly shown that the insurer was in fact arbitrary, capricious, and without probable cause in refusing to pay. Spivey v. Super Valu, 575 So.2d 876 (La.App. 2d Cir.1991); Gipson v. Yosemite Ins. Co., 494 So.2d 1290, 1292 (La.App. 2d Cir.1986); McClain v. General Agents Ins. Co. of America, 438 So.2d 599 (La.App. 2d Cir.), writ denied, 442 So.2d 458 (1983).
To prevail under La. R.S. 22:658 A(3), a claimant must demonstrate that the insurer failed to initiate loss adjustment of a property damage claim within 14 days of notification of the loss by the claimant. This provision requires an insurer to take some substantive and affirmative step to accumulate the facts that are necessary to evaluate the claim. McClendon v. Economy Fire & Cas. Ins. Co., 98-1537 (La.App. 3 Cir. 4/7/99), 732 So.2d 727.
*752 To prevail under La. R.S. 22:658 B(1), the claimant must establish that the insurer received satisfactory proof of loss, failed to pay the claim within the applicable statutory period, and that the failure to timely tender a reasonable amount was arbitrary and capricious. Khaled v. Windham, 94-2171, p. 9 (La.App. 1st Cir.6/23/95), 657 So.2d 672, 679. Satisfactory proof of loss within the meaning of the statute is that which is sufficient to fully apprise the insurer of the insured's claim. McDill v. Utica Mutual Ins. Co., 475 So.2d 1085, 1089 (La.1985); Khaled, 657 So.2d at 679; Hart v. Allstate Ins. Co., supra.
Moreover, the statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and was acting in good-faith reliance on that defense. Rudloff v. Louisiana Health Serv. & and Indem. Co., 385 So.2d 767 (La.1979); Gipson v. Yosemite Ins. Co., supra; Henton v. Walker & Wells Contractors, Inc., 25,821 (La.App.2d Cir.5/4/94), 637 So.2d 672, 677. This is especially true where there is a reasonable and legitimate question as to the extent and causation of a claim; bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist. Fontana v. Louisiana Sheriff's Automobile Risk Program, 96-2752 (La.App. 1st Cir. 6/20/97), 697 So.2d 1037, 1040; Patin v. Imperial Lloyds Ins. Co., 95-841, p. 11 (La.App. 3d Cir.1/17/96), 670 So.2d 238, 244.
The determination of whether an insurer acted in bad faith turns on the facts and circumstances of each case. This is because a prerequisite to any recovery under the statute is a finding that the insurer not only acted (or failed to act), but did so, arbitrarily, capriciously, and without probable cause. As this determination is largely factual, great deference must be accorded the trier-of-fact. Smith v. Audubon Ins. Co., 95-2057 (La.9/5/96), 679 So.2d 372, 377; Khaled, supra.
It is well-settled that an appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, 92-1328 (La.4/12/93), 617 So.2d 880; Rosell v. ESCO, 549 So.2d 840 (La.1989); Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311; Bell v. USAA Cas. Ins. Co., 30,172 (La.App.2d Cir.1/21/98), 707 So.2d 102, writ denied, 718 So.2d 434 (1998). In fact, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, supra; Housley v. Cerise, 579 So.2d 973, 977 (La. 1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong but whether the fact finder's conclusion was a reasonable one in light of the record evidence. Theriot supra; Stobart, 617 So.2d at 882-883.
The Louisiana Supreme Court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Stobart, supra; Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Under these established principles, a fact finder's conclusion concerning the assessment of statutory penalties and attorney fees should not be disturbed unless the trial court was manifestly erroneous or clearly wrong. Fontana v. Louisiana Sheriffs' Automobile Risk Program, supra; LaHaye v. Allstate Ins. Co., 570 So.2d 460 (La.App. 3d Cir.1990), writ denied, 575 So.2d 391 (1991).
A cause-in-fact determination, such as that involved with the foundation claim, is also one of fact and must be accorded the same deference. Cay v. State, DOTD, 93-0887 (La.1/14/94), 631 *753 So.2d 393. Likewise, this factual finding may be reversed only if the trial court is manifestly erroneous. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310.

Discussion-Washroom Claim
Plaintiff claims that St. Paul failed to comply with the statutory time limits for either initiating a claim investigation or producing its ultimate tender for the plumbing damages. If R.S. 22:658 prescribed strict liability, and were to be mechanically applied, this assignment of error might have substance. The plain language of the statute, however, requires a determination whether the insurer acted arbitrarily, capriciously, and without probable cause. It is equally clear that this determination is one of fact based on the unique circumstances of each case. Smith v. Audubon Ins. Co., supra.
In the present case, we find no manifest error in the district court's finding that St. Paul did not act arbitrarily, capriciously, or without probable cause in either investigating or paying the plumbing claim.
From the record we note that because plaintiff sent his initial report to the wrong person, in the form of a letter dated April 7, 1997, St. Paul contends it did not receive notice of his claim until June 3, 1997. Shortly thereafter, St. Paul's claim adjuster, Zimmerman testified that he made repeated attempts by telephone to contact the insured beginning on June 4. When Block did not respond, he wrote a letter to him on June 11, which Block answered on June 26. In what can best be described as an unfortunate comedy of errors and scheduling mishaps, the final inspection of the plumbing damage did not occur until September 22. Shortly thereafter, St. Paul paid the plumbing claim without condition, based upon industry standards.
We also find no merit in plaintiffs argument that this tender of $1,960.20, which was derived from an estimate slightly higher than that produced by Block's own plumber, was in some way arbitrary, capricious, or without probable cause. As noted above, the Zimmerman letter which accompanied the payment clearly stated that if additional damage was discovered, then additional payments were possible. As such, St. Paul's payment on October 3, 1997 represents a tender of an amount, at that time which reasonable minds could not differ, and hardly a final or definitive settlement of the claim at the exclusion of any future work.
We also note that the statute requires submission of a "satisfactory proof of loss" in order for the statutory time limits to be invoked. As defined by case law, "satisfactory proof of loss" is that which is sufficient to "fully" apprise the insurer of the insured's claim, including the extent of the damage. Hart, supra. Although plaintiff's submission of a damage report and his theory as to the causation of the washroom damage placed St. Paul on notice of the claim as early as June 3, 1997, the insurer cannot be punished for not accepting plaintiffs naked assertions of the extent or even the causation of the damage without having the opportunity to verify these claims to at least a reasonable degree of satisfaction. Since a determination of whether an insurer's failure to pay within the time limits depends upon facts known to the insurer at the time of its action, St. Paul's desire to corroborate Block's estimate is certainly reasonable.
In this regard, the record indicates that St. Paul did take steps to ascertain Block's washroom claim in a timely manner but due to a series of circumstances, was unable to conduct an inspection until September 22. In part, this inordinate delay is attributable to St. Paul's insistence on performing an inspection by mini-cam in order to ascertain the loss. Although the decision to use a mini-cam may appear to be overly cautious, by itself, it does not rise to the level of vexatious behavior the statute was intended to punish. Block's behavior is likewise responsible for at least a portion of the delay, as established at *754 trial. The trial court could therefore reasonably conclude that St. Paul was not provided with "satisfactory proof of loss" until September 22, 1997 in light of the record which indicates that plaintiff contributed to the delay in inspection and his subsequent payment.
The Louisiana Supreme Court has defined the phrase "arbitrary, capricious, or without probable cause," as contemplated by La R.S. 22:658, as synonymous with "vexatious." Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's, 616 So.2d 1250, 1253 (La.1993). The Court further defined "vexatious refusal to pay" as "unjustified, without reasonable or probable cause or excuse." Id., citing COUCH ON INSURANCE 2d, § 58:70. Applying that guidance in the present case, while keeping in mind the great deference we are to accord a trial court's findings of fact, we do not find sufficient evidence in the record to conclude that the district court was clearly wrong in determining that St. Paul did not act in an arbitrary or capricious manner, or without probable cause. As such, Block's assignment of error lacks merit.

Foundation Claim Bad Faith Claim
Block also assigns error to the trial court's failure to award statutory damages under La. R.S. 22:1220 and 22:658 for St. Paul's handling of the foundation claim. Plaintiff claims that damages are appropriate notwithstanding St. Paul's successful reliance on the policy exclusion because, he claims, he never received formal notice of St. Paul's intent to invoke the policy exclusion prior to trial and that this is indicative of bad faith. We find that argument unpersuasive, for there are several factors in the record which clearly establish a reasonable basis for the trial court to conclude that St. Paul substantially complied with the statute. Initially, the record shows that Block accompanied St. Paul's adjuster, Ron McKinley, on an inspection of the property on July 30, 1997. McKinley testified that he advised Block that the cause of his foundation damage was indeed settling and not tree roots. As such, there is record evidence that Block was on constructive, if not actual notice that St. Paul would rely on its policy exclusion for settling damage. This is further indicated by plaintiff's subsequent action; he immediately filed suit two days after McKinley's inspection and before St. Paul could issue a formal denial of coverage.
Additionally, although St. Paul did not issue a formal denial of coverage, we note that it was plaintiff who placed the issue in contention by immediately filing suit and forcing St. Paul to defend the claim in court without any further negotiation or opportunity to respond outside of litigation. Although Block argues that St. Paul's failure to formally deny the claim once litigation had commenced is violative of the statute, we do not view it as such. Since R.S. 22:1220 and 22:658 are not applicable when an insurer has a reasonable basis to defend the claim, and that defense was presented in good faith, the assessment of attorney fees and statutory penalties is inappropriate in this case. Henton, supra; Johnson v. Fidelity & Casualty Ins. Co. of N.Y., 618 So.2d 651 (La.App. 2d Cir.1993). Obviously, since St. Paul ultimately prevailed on this issue, its defense was meritorious. See, Carter v. Davis, 95-2198 (La.App. 1st Cir. 5/10/96), 673 So.2d 362, 365 (plaintiff must sustain compensable damages for statutory penalties to be imposed). Accordingly, we do not find merit in Block's assignment of error to the district court's denial of the statutory penalties and attorney fees related to the foundation claim.

Foundation Claim Causation
Without formally assigning it as error, in his brief Block nevertheless challenges the district court's finding that the foundation claim was attributable to "settling" and not tree damage. Since causation requires a finding of fact, we attribute great deference to the district court's decision, reviewing it under the clearly wrong/manifest error standard.
*755 As noted above, Ron McKinley, a consulting engineer, conducted a detailed survey of the foundation slab on July 30, 1997. He testified that the soil's high clay content caused the soil to expand and contract as the moisture content changes, thereby allowing soil consolidation, which in turn caused the soil to lose much of its load-bearing properties. This, coupled with improper site preparation, resulted in slab settlement. He cogently explained that a tree five feet from the front of the house could not have caused a uniform one-inch subsidence of the rear one-third of the foundation.
In reaching his opinion, McKinley expressly rejected the position of Block's forestry expert, Steven Templin, that the foundation problem was due to the roots of a white oak tree. At trial, Templin admitted to not having an engineering background, and that he had never dealt with this type of situation before. Templin also did not consider soil problems in Block's subdivision, drainage around Block's house, nor did he do an elevation profile. Significantly, Templin admitted that could not disagree with McKinley's analysis of soil settlement.
The trial judge was presented with two permissible views concerning the causation of the foundation claim. Both sides presented expert testimony advancing viable, yet conflicting theories. In his order, Judge Sharp clearly chose the testimony of St. Paul's expert, Ron McKinley, and rejected that of plaintiff's expert. Accordingly, the trial court's finding in this regard was not manifestly erroneous, since, as in this case, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, supra; Housley, supra; Sistler, supra. Considering the heavily contested issue of the causation of the foundation damage, we find that the trial court's conclusion that St. Paul had not violated R.S. 22:658 and R.S. 22:1220 was not clearly wrong. The assigned error lacks merit.

Foundation Claim "Settling" vs. "Collapse"
Although also not assigned error by plaintiff in his appeal, both sides addressed, both in their briefs and at oral argument, plaintiffs contention that the foundation claim was in fact a result of a "collapse" rather than "settling" under the St. Paul policy. This seemingly minor distinction carries an important ramification-for if the damage results from a "collapse" it is covered under the policy whereas damage from "settling" is expressly excluded.
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Louisiana Civil Code. Louisiana Insurance Guaranty Assn. v. Interstate Fire & Casualty Co., 93-0911 (La.1/14/94), 630 So.2d 759. The parties' intent, as reflected by the words of the policy, determines the extent of coverage. Such intent is be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy. Id.; Adams v. Falcon Equip. Corp., 30,754 (La.App.2d Cir.8/21/98), 717 So.2d 282, 289. Foremost, an insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Adams, supra; Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2d Cir.), writ denied, 588 So.2d 100 (La.1991); Jefferson v. Monumental General Ins. Co., 577 So.2d 1184, 1187 (La.App. 2d Cir.1991); Harvey v. Mr. Lynn's, Inc., 416 So.2d 960, 962 (La.App. 2d Cir.1982).
Block argues that his cracked foundation is a "collapse" of his building rather than a "settling." In support, he cites Shields v. Pennsylvania General Ins. Co., 488 So.2d 1252 (La.App. 4th Cir.1986), a Fourth Circuit case in which foundation settlement caused the front corner of a house to drop. In that case, because the homeowner's policy *756 contained no unambiguous definition of "collapse," the court construed the term broadly to encompass the foundational and other damage sustained by Shields, adopting the dictionary definitions of the terms "collapse" to mean "to fall in together, cave in" or "to break down suddenly," and of "settling" to mean "to sink" or "to become more dense by sinking." Shields, supra at 1256. The court correctly concluded that based on the reasonable interpretation of these two words, that they were intended to have opposite meanings, and since the plaintiff suffered instantaneous structural damage, the event could be characterized as a "collapse." Block urges that a similar analysis is appropriate in the instant case.
Although "settling" is not defined in the instant policy, it does state that "collapse does not include settling, cracking, shrinking, bulging, or expansion." In Nida v. State Farm Fire & Cas. Co., 454 So.2d 328 (La.App. 3d Cir.), writ denied, 458 So.2d 486 (1984), the plaintiff similarly argued that the damage to his home caused by shrinkage and expansion of the clay soil on which the house was built constituted a collapse as opposed to a settling condition. In a well-reasoned discussion of the history of the jurisprudence on this issue, the Third Circuit affirmed the lower court's judgment in favor of the insurer. Specifically, the court found that in light of a policy which specifically excluded "settling, cracking, shrinking, bulging, or expansion" from the definition of "collapse," the periodic swelling and contracting of the earth, or "differential earth movement" fell under the "settling" policy exclusion. Notably, the First Circuit rejected similar plaintiff's claims in two subsequent analogous cases. See, Andreasen v. City of Houma, 537 So.2d 318, 321 (La.App. 1st Cir.1988); Barbier v. Wade, 517 So.2d 321, 325 (La. App. 1st Cir.1987).
Because the instant policy specifically states that "collapse does not include settling, cracking, bulging or expansion," and there is no showing that any part of Block's house collapsed, we distinguish the Shields case for in that case the plaintiff suffered instantaneous structural damage, and not gradual damage over time, as did Block. The district court properly found that the settling exclusion applied.

Conclusion
For the reasons expressed, the judgment of the trial court is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] At trial, Block introduced a St. Paul form "denial" letter dated May 28, 1997, but it did not refer to this specific claim. Moreover, Meyer testified that the letter, if sent from St. Paul, must have been in error as it did not originate from the office handling Block's claims, nor did St. Paul have any record of it being sent. Nevertheless, we pretermit any further discussion of this letter's import since the trial court heard this evidence and weighed its credibility accordingly.
[2] The pertinent section of the insurance policy read:

"Section I-Perils Insured Against
We insure against risks of direct loss of property described in coverages A and B (Coverage A-Dwelling, Coverage B-other structures) only if that loss is a physical loss to property; however, we do not insure loss caused by: (6) settling, shrinking, bulging or expansion, including resultant cracking of pavements, patios, foundations, walls, floors, roofs, or ceilings."